## REYNOLDS et al. v. SACO–LOWELL SHOPS et al.

District Court, M. D. North Carolina.

June 9, 1943.

E. O. Ayscue, of Monroe, N. C., and John M. Robinson and Hunter M. Jones, both of Charlotte, N. C., for plaintiff W. G. Reynolds.

Frank H. Kennedy, of Charlotte, N. C., for plaintiffs E. A. Terrell and Terrell Mach. Co.

Hugh D. McLellan and Hector M. Holmes, both of Boston, Mass., and Julius C. Smith, of Greensboro, N. C., for defendant.

HAYES, District Judge.

This is a suit to recover royalties under a license agreement relating to patent agreement No. 1,738,796 dated December 10, 1929, and patent No. 2,238,659 granted April 15, 1941, to W. G. Reynolds, who assigned one-half of the first patent to E. A. Terrell and one-half of the second patent to Terrell Machine Company. The first patent covered process and mechanism for the manufacture of roving or yarn, while the second patent was for improvement in fiber drawing mechanism and process. Reynolds is a practical and experienced mill man who has devoted his entire life in textile plants. Defendant is one of the three largest textile machinery manufacturers in the United States with a long and enviable record in its field.

Reynolds had spent many years in an effort to improve the conventional method of drafting in the roving department. These words were very confusing to the court at first, but the exhibition of the raw material and the process and mechanism employed in the conversion of the raw material into a final stage of twisting into yarn gave the court some familiarity with the subject. When the raw material comes to the conventional roving machine it is a strand approximately two inches wide and approximately one-half inch thick, but it is very loose and very easily pulled apart. The purpose of drafting this strand which is called a sliver is to stretch it in an effort to get the fibers of the cotton lengthened in parallel shape. At the time of Reynolds' invention only the drafting or stretching could be performed on a single machine. The first draft was timed to stretch the tender sliver to the limit of its endurance without pulling it in two. It then became

necessary to fold the flattened sliver again and put it into another roving machine where it was again drafted or stretched. The industry had sought in vain for a process and mechanism which would eliminate this refolding and running it through another machine. Reynolds solved this problem in a general way by his first patent and constructed mechanism designed to carry out his process. Representatives of the defendant saw Reynolds' machine in operation in Dan River Mills in Danville, Virginia, in 1933, and initiated negotiations with him which resulted in a license agreement, hereinafter referred to, and in Reynolds' accepting a position of employment with the defendant for the purpose of working with defendant's engineers in the construction of mechanism or improvements thereon to make the patent a commercial success and with the understanding that a second application would be made by Reynolds covering the improvements in fiber drawing mechanism and process which in turn would be covered by the license agreement. Pursuant to this arrangement he began work in defendant's plant at Biddeford, Maine, in July, 1933, but the license agreement was not finally reduced to writing until December, 1933. He worked on with the defendant until November, 1934. When the license agreement was being prepared and before it was actually signed, Reynolds sought to confine it strictly to the "Tongued and Grooved Process" but the defendant insisted on terms much broader and in the form finally adopted by the parties. The contract was prepared by defendant's counsel who have participated in all of the patent proceedings and in this trial.

The application for the second patent was made on January 23, 1934, while Reynolds was still working at the plant of the defendant and defendant's counsel collaborated with Reynolds' counsel in the preparation of the application. The situation of the parties at that time contemplated faithful co-operation in the development of the Reynolds process and mechanism and in coverage by the second patent.

The conditions prevailing in the textile industry prior to October, 1934, the unsuccessful tests which had been made, and the part which Reynolds played in solving the problem are set forth at length in the defendant's Bulletin for October, 1934, from which we quote some excerpts.

"New Saco-Lowell Controlled Draft Roving"

"It is a matter of common knowledge among mill men that the roving department, involving a multiplicity of operations and excessive handling of the roving has not kept pace with the improvements in other branches of cotton manufacture."

"For years we have recognized the need of specific improvements for this department and have been actively searching for methods and equipment which would accomplish these ends. It is apparent that multiple roving operations naturally result in many piecings; stretching of the roving as it passes from the creel, through the flier and around the passer arm; and introduce the possibility of singles, and of faulty splicing.

"Therefore it seems obvious that these irregularities were a natural consequence of the repeated handling of the roving in each drafting and winding operation, and actually were introduced to a great extent by the roving frames themselves."

"It was obvious that these irregularities and consequent doublings could be reduced if we could sufficiently reduce the number of times the roving is handled and creeled, and could even be practically eliminated by limiting the roving operations to the irreducible minimum of a single process. This we set as our goal, but it called for a machine capable of drafts far beyond the limits of the conventional frame, and, for medium and fine yarns, roving drafts higher than anything ever accomplished on a production machine."

"We found at that time, and still believe, that any belt system of long draft yet developed, or worked out on a practical basis, is not suitable for roving equipment, because of the heavy, loose mass of cotton necessarily handled in roving frames. While these systems worked admirably on spinning, the great amount of fly produced in the roving operation caused frequent 'Bungups' which interfered with the proper functioning of the drafting elements and could damage the aprons and rolls."

"Continuing our research, we extended our investigations to other methods of performing the roving operations in one process. These studies covered a number of arrangements, based on such ideas as adding a moch twist, the use of multiple drafting rolls, and the application of various forms of slip rolls. * * * While in some instances these machines have given satisfactory performance. * * * We

again were not satisfied that we had a machine which would completely meet our specifications of quality, simplicity and economy. The maximum drafts were adequate to handle certain organizations on coarse yarns in a single operation, but none was capable of producing a single process roving fine enough to permit double roving in the spinning frames, and so, economy could be obtained only at the cost of impaired quality, except in the case of very coarse numbers."

"As a result of this preliminary work we were convinced that any new roving frame worthy of general acceptance by our customers would have to meet a number of definite requirements and we accordingly set up the following specifications as a definite goal:

"(1) It must produce roving equal in every respect to that produced by a conventional system.

"(2) It should be of simple and rugged construction.

"(3) It should be easily operated and should not require any more care or cleaning than a regular frame.

"(4) It should effect a substantial reduction in card-room costs.

"(5) It should be adaptable to conventional roving frames.

"(6) It should be capable of drafts which will permit the production of the more usual yarn numbers with one process roving and use double roving in the spinning creel.

"The attempts made by ourselves and others to develop a new system of roving * * * have included several ideas which have been carried along to various degrees of practical application * * * but in every instance they failed to measure up to the standards mentioned above."

"Naturally these indications prompted us to redouble our efforts in finding and devising the kind of equipment which would make single process roving completely practical."

"In the course of our quest, we investigated a unique and decidedly original idea developed by Mr. W. G. Reynolds, well known to Southern Mill executives. Careful observations of the system convinced our engineers that it held real possibilities as a basis for an entirely new system of drafting for roving. We subsequently arranged to take over his invention and had him join our engineering organization to work with us in perfecting the application of his idea to roving equipment.

"With the background of Mr. Reynolds' experience with the device and our research in the general field of long draft as applied to roving, this development came along rapidly, and during the past year several frames have been in operation in mills in the vicinity of our shops for the purpose of making minor adjustments and working out the best methods of operation."

"From the first we had realized that this new drafting mechanism is a radical departure from conventional ideas of roving machinery and in the matter of doublings it is a wide-open break with tradition. * * * The facts as developed in actual mill use, regarding the performance, economy and simplicity of the machine square in every respect with the specifications we had set up as our practical ideal. It provides a unique, simple and effective method of eliminating unnecessary roving operations, and for most organizations makes possible the production of roving for the spinning frames of the required quality and size by a continuous controlled draft, in a single operation."

"This development of the Controlled Draft Roving is characteristic of the Saco-Lowell policy of continually searching for means of simplifying and improving cotton mill operations. The system we believe will revolutionize card-room practice and prove to be one of the most important developments of recent years in textile machinery."

The patented device and process revolutionized roving in textile plants and became a pronounced commercial success. Six men with this patented device could do the work generally requiring eighteen; one machine did the work of two, sometimes three.

The license agreement covered both patents and all of the claims not finally rejected under the second patent. The defendant was to pay royalties of fifteen per cent, but plaintiff later agreed to reduce the royalties to ten per cent to help defendant meet competition. Under this arrangement defendant paid plaintiffs in excess of $100,000 royalties up to and including 1937, but since that time has ceased to pay any substantial sum.

The Reynolds machine was known as defendant's Model D. In 1937 the defendant came out with another model which was called defendant's model J–1, J–2 and later

J–3. This new model is the bone of contention between the parties, the plaintiffs contending that they are entitled to royalties on these models on the ground that they are the mechanical equivalents of the Reynolds patents and covered by the license; and that they are the result of the inventive idea of Reynolds confidentially disclosed to the defendant and subsequently appropriated by the defendant and embodied under the claims of the second patent to Reynolds; or if not embodied in said claims they were produced under a patent issued to Jones, defendant's employee, and assigned to the defendant embodying the invention of Reynolds, confidentially disclosed to the defendant, and that the defendant should be declared a trustee for the benefit of plaintiffs and held accountable for the royalties. The defendant contends that the J models were not infringements on the Reynolds patents and that they are not liable for any royalty. While defendant concedes that he is estopped to deny the validity of plaintiff's patents, it contends now that on account of the prior art, the Reynolds patents really disclose nothing new of a substantial nature and that if any of the methods or mechanisms of its J models resemble features of the Reynolds D Models, that they are the embodiment of ideas well known to the art and covered by patents long before the Reynolds patents.

Both of the Reynolds patents contemplated the employment of a tongue and groove roll in connection with the second drafting operation in the single process system, although the second patent disclosed that the forming device could be a stationary member as distinguished from a rotating tongued and grooved rolls. A pair of rolls received the sliver or strand of cotton and fed it to a second pair of rolls. The second pair of rolls revolved faster than the first pair with the result that the sliver was drafted (stretched). Instead of dropping the product into a can and refolding it and feeding it again into another machine, Reynolds had a third pair of rolls which operated to receive the sliver into tongued and grooved parts of the rolls in such way as to fold the narrow strand into a rectangular shape bringing the outer edges (selvages) inward toward the center, so that the sliver could be condensed and held within these folded between the third pair of rolls and fed into a fourth pair of rolls which rotated at a faster speed so as

to give the sliver a second draft and have it ready then to be spun into yarn. In this process arrangements were made to keep the sliver under control against transverse and vertical expansion, to keep this sliver uniform in its thickness and distribution and to produce the desired product without waste, in one continuous process.

As early as May, 1934, Reynolds made a stationary device (sometimes called a block, sometimes a trumpet) and he showed it to the defendant's employees. Strange as is may seem defendant's employees all seem to have lost sight of this but there can be no doubt about the fact for Burnham, defendant's draftsman, made a blueprint of it and it bears the date of May 11, 1934. Reynolds wrote his lawyers about it at that time and also Mr. Terrell, and both the letters and the blueprints were produced at the trial. Tests were made on the stationary device and a better result was obtained than on the rotating tongued and grooved roll. Defendant's employees at that time told Reynolds not to let any information of that get out of the shop and Reynolds wrote his attorney about it at that time. Jones, defendant's engineer, and who later obtained a patent on it and assigned it to defendant, and from whom the J Model takes its name, made tests on it and a written report to his superior officers in May, 1934. Under date of May 5, 1934, Jones reported "Mr. Reynolds also proposed using a grooved bar as a folding and doubling element in place of the folding roll," and on May 12th reported "made tests with both revolving and stationary folding rolls, using pepperel cotton, stationary type made slightly stronger yarn." Reynolds left the block in possession of the defendant, but defendant's agents all seem to have lost sight of it entirely until it was called for in this trial. However during 1936 the defendant's employees were still working on it and on February 23, 1937, Jones filed an application for a patent on J–1 while the application for the second Reynolds patent was pending. The only substantial difference as I see it between the J Models and the D Models is the fact that a stationary folding block is used between the second and third pairs of rolls to take the place of the function performed by the tongued and grooved rolls in the third pair of rolls in the Reynolds Process. The result produced on the roving is almost, if not entirely, identical.

■ The claims under the second Reynolds Patent embody the stationary block, but the defendant contends that these claims could not be valid as against the defendant because plaintiff did not originate it and got the idea after he saw it on exhibition in 1937 and filed an amendment to his claims. The patent officer, however, after the claims were put in interference awarded the claims to Reynolds. I am of the opinion that Reynolds is the originator of the mechanism and the process and that the defendant adopted the J model primarily to escape royalties on the D model; that the J model is covered by the claims of the Reynolds patents and that the defendant ought to pay royalties on the J models as well as the D models. The real question in this case is whether the J models 1, 2 and 3 fall within the scope of the contract and the correct answer to the question depends more on a correct construction of that instrument than upon technical points between the patents and the patent infringement cases. What was said by Mr. Justice Holmes in Eclipse Bicycle Company v. Farrow, 199 U.S. page 581 at page 587, 26 S.Ct. 150, at page 152, 50 L.Ed. 317 is pertinent to this case. "The royalty is to be paid on the 'invention above referred to.' The use of the word 'invention' does not open the state of the art and allow the defendant to meet the plaintiff's claim by proving that he had invented nothing new. The royalty is to be paid on the invention described in the specified applications—that is to say, on the contrivances there described—unless and until there is final adverse action by the Patent Office. That is the measure of the defendant's self-protection. It could not have asked or been allowed more. For it took an assignment of Farrow's right, title, and interest, took charge of his applications, and agreed to defend the invention against infringement, which, of course, involved maintaining its novelty and patentability. * * * It should be repeated that, so far as the company made any device embodying Farrow's invention, by the fair construction of its express covenant it was bound to account, whether the manufacture was ostensibly Farrow's or not, and he was not left merely to an action for such damages as he could prove."

Quoting further from that opinion. "Furthermore, the provision for the cessation of payments on final adverse action must be applied to such claims as were rejected for want of novelty; and, after such rejection, Farrow can make the defendant account only for the use of devices embodying what remained of his claims. Obviously, also, the fact that, subject to the foregoing qualifications, the defendant took the risk of the value of Farrow's alleged invention, even when coupled with its covenant to use due business diligence in pushing their sale, did not preclude it from using any later invention, if one were made which superseded Farrow's and did not embody it."

The above case covers this case in the view that I take of it.

The so-called Jones patent did not supercede the Reynolds invention. They are embodied in the patents issued to Reynolds. The Reynolds patents not only covered the mechanism there described and that which should be adequate to the purposes taught by the patent, but the patents also covered the process and method of controlling the strand during the drafts in a continuous and single process. The contentions of the defendant in regard to the additional claims under the second Reynolds patent seem to be answered adequately by the court in Proctor & Gamble Manufacturing Company v. Refining, Inc., 4 Cir., in 135 F.2d page 900, decided May 21, 1943. The position of the defense based on prior patents and the prior art is likewise fully met by the Proctor and Gamble case, cited above. It is not necessary to re-state what the defendant itself thought of the Reynolds system as expressed in its October Bulletin 1934. It was the Reynolds' controlled draft system which revolutionized the industry.

■ The court is not impressed with the contention of the defendant that it was compelled to abandon the Reynolds device on account of excessive cost of maintenance. The proof in this regard was not satisfactory. While there were generalizations concerning expense in maintenance, the proof was not specific nor satisfactory. If the defendant is permitted to escape royalties on the J model frames, it will save a sum now in excess of $200,000. This sum undoubtedly has already exceeded by far the so-called maintenance expense. Here we have an unusual situation. The defendant not only obtained a license to make and sell all machinery embodying the inventions of the first and

114

second patents but it agreed and published to the world that it had employed Reynolds to work in co-operation with its staff in an experimental effort to develop and improve the process and mechanism necessary to accomplish a long desired result, to-wit, a single process roving. The contractual relation between the parties called for good faith on the part of both of them. The exercise of this good faith was demanded throughout the life of the contract. Each party was to use due diligence in the development and successful production of the patented device. Pursuant to this arrangement Reynolds labored with the defendant's employees to make a success of the undertaking from which both expected to profit. The idea of a satisfactory folding block came to Reynolds first in the course of this experimental work and he disclosed it to the defendant. The defendant appropriated it to its own use and now seeks to avoid the payment of royalties on the ground that it was not Reynolds' idea or conception, that it was nothing new in the art and that other patents dealing with trumpets cover the device. The arguments made and the authorities cited by the defendants against the validity of the claims in the second Reynolds patent lose their force when applied to the essential and established facts in this case. The case of Baker Oil Tools v. Burch, 10 Cir., 71 F.2d page 31, applies here. The defendant's president, Edwards, testified that he insisted on Reynolds disclosing all he knew about his invention that would be helpful in making it a commercial success. It is unconscionable for the defendant to obtain Reynolds' knowledge on the matter of his inventions in order to make it a commercial success and then deny him of the benefit of it by the methods disclosed in this case. The fact that Jones obtained a patent on the stationary device embodying the results of the conversation between him and Reynolds and Burnham and that the defendant took the patent assignment from Jones and now denies royalty on it to Reynolds, places the defendant in an unfavorable position. The Jones device had a pin or mandril in it to help fold sliver. This was characteristic of J–1 but J–3 omits the pin. There was no pin in the block originally designated by Reynolds in May, 1934. Although Reynolds was compelled to include all of his knowledge pertaining to the inventions at the time the contract was signed, the evidence clearly indicates that the defendant's agents in authority were developing secretly the stationary block which finally came forth in 1937 and was placed on the market for the deliberate purpose of displacing the Reynolds devices.

The courts cannot make a contract between the parties but must deal only with the contract which the parties themselves have made. While I am of the opinion that the J models are clearly covered under the claims of the second patent and that the defendant is liable for the royalties thereon which disposes of the case, still I am of the opinion further that under the circumstances of the case the Jones patent was obtained in breach of faith and that the defendant should be declared a trustee for the benefit of the plaintiffs and required to pay a royalty. The defendant neglected to do its part in helping to obtain the second patent embodying the results of the improvements discovered by the joint efforts of themselves and the plaintiff. In fact it did all it could to prevent the allowance of the plaintiff's claims. While it may appear a hardship on the defendant to pay the royalties on the J models, I am convinced that they are but the fruits of the Reynolds invention and that equity and good conscience require it to pay the 10% royalty. It should be contented with its 90% of the sales.

Numerous authorities have been cited in the excellent briefs submitted in behalf of the parties and the court has given due consideration to them, but on account of the length of this opinion no further reference to the authorities is necessary.